Good morning ladies and gentlemen. We're pleased this morning to have District Judge Michael Reagan of the Southern District of Illinois sitting with us. Our first case for argument this morning is Village of Old Mill Creek against Star. Mr. Verrilli. Good morning and may it please the court. The Illinois Zero Emissions Credit Program dictates the payment Exelon receives in connection with the interstate wholesale sales of electricity from Exelon's Clinton and Quad Cities plants. The program is preempted because it guarantees Exelon a subsidy for 10 years for all of the output of these plants which will necessarily be sold into wholesale markets and it calibrates that subsidy to cover the gap between what Illinois thinks these plants need to stay in wholesale auctions. Now I would prefer to spend the entirety of my time at the podium this morning focused on the merits but I will just ask whether the court has any questions with respect to the cause of action issue. If it does I'll be happy to address them. Well I'm not sure how you would like to classify my question probably as a question for some other case but my question is isn't this litigation within the doctrine of primary jurisdiction so that we should just wait for the FERC to render its decision in the pending applications? I think not and a couple of things about that. First I think the question before this court as the case comes to this court given that the district court didn't exercise primary jurisdiction would be whether. Well the district judge did not tell the parties that until the FERC has spoken it will refuse to act. Right and therefore I think the question before this court be whether that was an abusive discretion. I think it's hard to say that it was. As far as I can tell the district court didn't talk about primary jurisdiction and I couldn't find any discussion of that in the briefs. That's that's correct your honor I don't think either party suggested that primary jurisdiction. Yeah but now now it's been suggested. And and I do think that it's not an appropriate case for primary jurisdiction because this is a case like Hughes like the Third Circuit case PPL that accompanied Hughes in which the question ultimately is a question of law in which the courts got to answer the same question that the Supreme Court. I must say I don't see how it can be a question of law. The argument is that this state law is interfering unduly with the way in which the FERC auctions in which the auctions required by the FERC proceed. In other words it's it's just a proxy for an argument that federal regulatory procedures are being jammed. Why isn't that something the FERC needs to tell us? Does it think that its procedures are being interfered with or not? Well you could invite them to tell you in the way. There are two ways to go about this. One is to ask the United States for an amicus brief and the other way is to invoke the doctrine of primary jurisdiction. Well I don't see how we can responsibly decide the case without doing one or the other. So and and as between the two I guess I would strongly urge you to do the first your honor and I think perfectly appropriate to do the first. I thought the district court did that and and was declined. And FERC was unable because they lacked a quorum to respond at that point now they have a quorum now they have a new chairman you know this often happens in transitions from one administration to another but now they're fully geared up so I do think. And of course our invitation would not be to the Commission it would be to the United States. Well that it could be to either I guess technically your honor but. And the Solicitor General might or might not ask the Commission. Based on experience I'm quite sure that would ask the Commission. Yes I have some reason to think that might happen. In any event I think that the proper course here is to follow the same course that the courts did in Hughes and in the Third Circuit PPL case and I do think in particular that the field preemption issue as well as the Commerce Clause issues are issues of law. The field preemption issue is a question of what domain did Congress give exclusive authority to FERC over. And now I agree with your honor that the conflict preemption issue is a little bit more complicated but with respect but certainly with respect to the field preemption issue that is a little trouble answering in the Hughes case. So I do think it's a it's a case that should proceed to the merits and I do but I do of course do you think it would be appropriate to ask for the views of FERC and or the United States. But the regulatory scheme the state regulatory scheme here doesn't operate on your clients. Your clients are bystanders to it. I understand that my friends on the other side have made that argument but I think that that that does go to the question of scope of the equitable cause of action that we've started. I don't think it's correct to say that we're bystanders in the sense that we participate in this in this industry and we are injured in fact by the provision of the subsidy and they test that. I'm not questioning standing I'm questioning the scope of the ex parte young. Right I appreciate your honor's question and I do think and I certainly well aware of your honor's opinion in the Planned Parenthood case and would not presume to tell your honor how to read that opinion but but as the opinion self recognizes the the view expressed in that opinion about the scope of the ex parte young cause of action was dictum and it was dictum that was predicated on a prediction based on what the dissenters in the Douglas case had said with respect to the scope of the ex parte young cause of action. But what I would suggest to your honor is that when the Supreme Court ultimately confronted that issue in Armstrong a they resolved it in a different way and I think it's quite clear from the face of the opinion that the court accepted the proposition that one could have a cause of action under ex parte young even if one were not asserting an anticipatory federal defense to a state enforcement action because that was not the case in Armstrong at all and there would have been no need for the court to go through the elaborate exercise of deciding whether the door was closed by or hadn't been open in the first place. Except that Armstrong wasn't a preemption case. Well it has implications for preemption doctrine under ex parte young but it wasn't a preemption case. It wasn't but it's but if anything it's a it's a weaker case than a preemption case for the for the for the existence of the ex parte young cause of action. I do think this is a very important point with respect to Armstrong. It wasn't an accident that the court decided that there was an equitable cause of action if the court defined it in the way that it did particularly page 1384 of the opinion. The question of whether ex parte young ought to be limited to anticipatory assertions of of a federal defense for state enforcement action was vigorously litigated. If you look at pages 38 to 50 in the brief of the state officials you'll see that once they get by the question of whether the supremacy clause affords a cause of action they for 12 pages argue that the caught that the ex parte young cause of action ought to be limited in this way and if the court thought that was right that would have been a very easy way to dispose of the case but they didn't dispose of the case on those grounds and then in addition to that of course you have Hughes in which the ex parte young claim went forward and was. But that issue was specifically reserved. That's true your honor it was reserved in a sense but the court didn't really have any difficulty applying the law and resolving the issue and it and it is reflective of actually a very long history which we've tried to detail in our reply brief of cases in which courts have adjudicated preemption issues including in situations where they don't involve. Pre Armstrong when there was a presumption that the supremacy clause affords a freestanding. Well I don't think the cases like Crosby and supremacy clause cause of action they rely as I think Justice Scalia's opinion explains in Armstrong on the existence of a judge-made remedy in equity. That's that's what those cases are grounded and it's what they've always been grounded in and this then the scope of that remedy has always been broader than the anticipatory assertion of a defense to a state enforcement action. In fact one way you can see that is by looking at one of the cases cited by Justice Scalia in the Armstrong case it's the American School of Magnetic Healing case. That's a 1902 case in which the plaintiff actually brought an ex parte young type action against a federal official and it was a company that the postmaster was refusing to deliver the mail because he thought the company was practicing quack medicine and the company went in and said hey you have to federal law requires that you deliver the mail to us. In the court that was a valid cause of action Justice Scalia cited it as an example of the kind of thing that it was within the proper scope of ex parte young and that really doesn't have anything to do with the anticipatory assertion of a of a federal defense to an enforcement action so I really don't think that I really don't think that that limit is in the law. You have law from other circuits expressly saying that the scope is broader so and I do think it would actually be quite a profound sea change to recognize that kind of a limit. You would be saying that a whole host of cases including cases that the Supreme Court and Armstrong validated were wrong to allow the case to go forward. The other question lurking in the background after Armstrong for preemption doctrine is whether there there must be a plausible assertion of a federal right. I think answers that too your honor and that if you look at the starred footnote in Armstrong what they what the court notes is that that the plaintiff there didn't assert a statutory right as you would need under 1983 and of course you need it under 1983 because as a matter of statutory construction because it gives you a cause of action to enforce a right under federal law. Now the court said in Armstrong well the plaintiff here doesn't have isn't asserting a right doesn't have a statutory right. If that were sufficient to cut off the cause of action again there would have been no need to go through the elaborate analysis of the elaborate analysis into whether the statutory limitations closed the door to an otherwise available cause of action. The cause of action wouldn't have been available in the first place. So I do think that Armstrong goes a very very long way to answering both of the questions that your honors posed and again I would say it would really be a sea change in the understanding of the traditional scope of an equitable cause of action against unconstitutional state or federal action to limit it in these ways. There's no doubt about that. What is a preemption claim? Is it a statutory claim or a constitutional claim? I think in terms of the right in question? It's both I think your honor. It's that where we are we are asserting a cause of action in equity to enjoin unconstitutional action by state officials which is action that they don't have the authority to undertake because it is preempted by virtue of the supremacy clauses dictate that federal law governs and the federal law that governs here is the Federal Power Act. If the Federal Power Commission were to issue an within our scope they result in rates that are still just and reasonable. Would you have any remaining statutory objection? Yes we would have a field preemption argument that they got it wrong. No no would you have a remaining statutory objection? What statute would the FERC have violated by taking that stance? I think I don't think it's likely that the FERC will come to that conclusion but if they did if they did. If we knew what conclusion they were going to reach I wouldn't have asked you the primary jurisdiction question. I appreciate that your honor. So but I think we would have an argument that that would be a default on FERC's part in that the statute assigns exclusive authority to FERC to decide whether these whether these because these practices do affect wholesale rates. Yes and I'm asking you to assume that FERC has said we've looked at this they're fine by us. Yes and if they're what statute would that violate? It wouldn't because they would be exercising their authority in that circumstance to say that the rates are just and reasonable which is their job. Yeah. The problem here is that the state is exercising the authority. Well the problem is that the state has done something and the FERC so far has done nothing and you're asking us effectively to predict that the FERC will do something. My colleague's question about ex parte young is really just a variant on the primary jurisdiction question. Given that there's an elaborate framework for getting the view of the agency can you use ex parte young to bypass that? So I guess I would flip that cause of action within the traditional understanding of equity and because but if the FERC says this is fine it sounds to me like you don't have a claim. Well that's because they will have exercised their jurisdiction but but the problem here is the state has exercised its authority that interferes with the FERC's exercise. Let me ask you a variation of this. Suppose Illinois establishes a carbon cap-and-trade scheme. Does that violate the Federal Power Act? No we don't think that that intrudes on FERC's exclusive authority. And why? Well because the difference between a cap-and-trade scheme. Don't ask, don't tell me the difference between a cap-and-trade scheme and this scheme. Tell me why in your view it doesn't violate the act and then you can tell me the difference. Because because a cap-and-trade scheme doesn't guarantee for each output of for each for all outputs sold in the wholesale markets that the seller into the wholesale markets will receive a different rate than the FERC approved. But on your argument about what is required that there be no interference with the auction, why doesn't a cap-and-trade scheme interfere with the auction? It sets up a parallel pricing system that depends in part on the results of the auction. No it may it may have an indirect effect on the auction in the way that Hugh said was permissible because the state is pursuing a goal of a clean energy goal but the difference between that and this is the tether. I'm much less interested in the difference between that and this scheme then figuring out why in your view why you wouldn't be saying that a cap-and-trade scheme has the same defect as the zero emissions credit. Because of what the Supreme Court said in Hughes that even in a situation in which a state is acting within its traditional sphere of authority in Hughes generation here in generation if it chooses a means that intrudes on FERC's exclusive authority to set wholesale rates its actions are preempted and so that's why I keep focusing on the means your honor because the means makes all the difference that's what Hughes tells you to look at is the means. Means requires the purchase of credits that's what a cap-and-trade scheme requires but it doesn't requires the purchase of credits. The difference. And that will affect and the price of buying those credits will affect prices bid in the energy auction. Both this both the Illinois scheme and the cap-and-trade scheme establish prices in a separate trading market that inevitably affect the price in the auction. This scheme doesn't establish prices in a separate trading market that's the key it's not a separate trading market it's just an additional payment for units of output sold into wholesale. If this statute were exactly the way it is now and it had another provision at the end that said and the plants that receives that credit shall sell all their output into wholesale it would operate in exactly the same manner that it operates now. The Exelon will receive exactly the same credits for exactly the same output at exactly the same prices it wouldn't make any difference. And therefore it cannot be that the presence or absence of that particular provision is the difference between preemption and non-preemption and your honor that statute with that exact with that provision added to it would also raise exactly the same question that your hypothetical about cap-and- trade raises but there's no doubt under Hughes that that would be a preempted statute it's the same statute as Hughes. If I could I'd like to reserve the Mr. Giordano. Thank you your honors. Let me try on the primary jurisdiction question. I think the issue is that it's it's backwards that the Exelon generation and I think maybe this is the way with all due respect you're looking at this your honor is that any market distortion created by the state subsidy of the nuclear plants here can be addressed by FERC but that's backwards. Assume arguendo that nuclear plants are not properly compensated under the market rules of PJM and MISO. It's the job of FERC not the states to remedy that problem in the first instance. Well but that's why I asked the question why we don't just sit back and wait for an objection to be made in the FERC with a contention that prices influenced by the ZECs are not just unreasonable and FERC will tell us whether they are or they aren't. Well that that's a assuming assuming that they will I mean our our contention. If there is a complaint before the FERC it must decide it. It can't say we're taking 2018 off. No but the complaint before the FRC and the consumers don't have a complaint there but the generators do. The complaint says that they're asking to FERC to adjust market rules in in reaction to the state subsidy and that that that that cannot be done effectively and to preserve a competitive market. They're not there's no complaint in front of FERC asking whether the state the state subsidies prevent FERC from from maintaining just and reasonable rates in the wholesale market but that's what it does. The FERC is not prevented by anything from maintaining just and reasonable rates. Question is whether an auction influenced by this state credit produces just and reasonable rates and I assume FERC can tell us whether it does or it doesn't. Well they let me ask you a question that's peculiar to the municipal and private plaintiffs in this litigation which is since you are not direct purchasers of power and Illinois unquestionably has the right to regulate retail power rates why are you appropriate litigants? Because under the we have we have prudential standing your honor. Don't ask forget about concepts like prudential standing. The Supreme Court abolished that in a Lexmark case. Just address my question in a straightforward way. Why are the municipalities and private users appropriate litigants? Because because you have you have standing to contest. Please don't talk about standing. I won't mention standing. But address my question I'd appreciate that. The FERC and the courts have held that consumers have the right to challenge wholesale charges that are passed through to the ultimate consumer. And and why is that in light of the Illinois brick doctrine? The Supreme Court held in Illinois brick that the only people who can complain about excessive charges are the direct payors. That indirect payors can't complain. That's not a matter of standing. It's a matter of substance. But the indirect. Why doesn't the Illinois brick doctrine prevent your clients from litigating? That's the technical question. Because this is an automatic pass-through from from the Supreme Court has said to the Illinois brick sequence that that does not matter. They said that in the Kansas Utilities case. But the the the the issue here is you're you the the consumer is counsel are if you want to address Illinois brick that would be helpful. If you don't know what Illinois brick is because it hasn't been raised by any of the parties just say so. I mean I give the parties an opportunity but filibustering won't help. Okay thank you. I mean I I've read the case a long time ago but it wasn't raised. That's what I thought. Nobody has briefed primary jurisdiction here and nobody has briefed Illinois brick and we may be asking for Okay your honor. I think I think one very important point to put this in context is that this statute is designed to subsidize two particular nuclear plants. The Quad Cities and Clinton nuclear plants. This really is the key to understanding the case. When counsel was talking about. That that just gets me to ask the question. It's a variation of the cap-and-trade question. Suppose Illinois levies a tax on all producers of energy and then uses the proceeds of that tax to subsidize two nuclear plants. Any violation of the Federal Power Act? I think so your honor because you. Really? Well you're you're you're because the the tax would violate the Federal Power Act? The Federal Energy Regulatory Commission has determined that that that competitive wholesale markets are the best ways to ensure the lowest possible cost for the nation's consumers. Yes, but taxes are ubiquitous. You think the energy producers could come and say look the income tax in Illinois is just too high. We can't produce energy at prices that will benefit consumers. So cut the income tax in half as a matter of interpretation of the Federal Power Act. Is that I think anybody who made that claim would be viewed as clinically insane. Well we're not we're not we're not making that claim your honor. You just told me it would be a good claim that a tax just all by itself a tax on energy producers would violate the Federal Power Act. If it was used to just benefit two particular plants. That's a subsidy. I'm just asking about the tax. All right well I would I would like to address the subsidy. I think it's very very important to understand that piece because the competitive market in Illinois has been a great success story. It saved the 37 billion dollars according to the amicus brief of the Illinois Industrial Energy Consumers in Illinois Chamber of Commerce since the market began in 1997. And these savings have occurred because the wholesale and retail electricity supply competitive markets have been a great improvement from the public utility monopoly structure state subject to state regulation which the competitive market replaced. And part of that change was that the utilities such as the Exelon Corp subsidiary ComEd were allowed to divest plants to non-utility subs of their of their parent companies. And then the charges of those generating plants were subject to federal rather than state regulation. And then FERC determined that capacity and energy markets conducted by the RTOs were the best way to provide electricity at the lowest cost. Unfortunately Defendant Exelon Generation determined it would not continue to operate its Quad Cities and Clinton nuclear plants unless it obtained legislation from the state estimated to provide a 2.35 billion dollar subsidy over 10 years. In other words Exelon now wants to operate their plants in a competitive market but wants to go back to the benefits of state regulation to augment its charges. Exelon simply cannot have it both ways. It can't go back to the to the benefits of state regulation which it used to have simply because its plants did not do as well as it would have liked. Fortunately this court can and should rule that the ZEC program is preempted by the Federal Power Act and violates the Commerce Clause. I'm sorry your honors I have to apologize. I'm a little confused here. This is the time for my total argument or? That's right. I would like to reserve the rest for rebuttal. You have 29 seconds. Thank you sir. That's all I need. Mr. Price. Good morning your honor. May it please the court. Matthew Price on behalf of Exelon Generation Company. I'd like to start if I may by addressing the court's questions on Armstrong and primary jurisdiction and then hopefully have an opportunity to spend some time discussing the preemption issue as well. My opposing counsel's argument about Armstrong seems to be that the court impliedly decided that Ex parte Young extends to bystander type actions in Armstrong even though the issue was never decided at all and in fact expressed the reserve. The court decided that case. You don't have to worry about Armstrong if you're going to talk about Ex parte Young. You have to talk about Seminole Tribe where the Supreme Court said if there is an elaborate statutory scheme for review of something then Ex parte Young can't be used to evade it. And there is a very elaborate statutory scheme for deciding whether electricity rates are just and reasonable. I agree there is a very elaborate scheme. So why haven't you argued primary jurisdiction? Well I think the reason is twofold. First of all the issue that's pending before FERC right now is the question of whether FERC should adopt bidding rules. It's not the preemption question. Certain bidding rules. Rules governing the bidding of plants into the FERC to adopt that according to plaintiffs would completely remedy their harm without ever needing to address the preemption issue. That's the complaint that they filed at the FERC and that's the issue that's pending before the FERC. But the second point is I think the reason why there's a draw to the primary jurisdiction concept is the very reason why this case shouldn't be before this court in the first place. I agree with the suggestion in the ultimately about a policy issue. Does the state program sufficiently interfere with the federal scheme so much so that preemption is needed as the remedy? And a preemption complaint can be brought to FERC. It can then be decided by FERC against a full record and then the statute channels review of that decision to a court of appeals after the FERC has issued its order. That's the mechanism. That sounds like a reason for making a primary jurisdiction argument but you haven't made it. One of the questions when we think about primary jurisdiction, despite the fact that it's got the word jurisdiction in it, I don't understand it to be a doctrine about subject matter jurisdiction. It's about prudent management of federal administrative cases and it may be a doctrine that can be waived and here it has not been invoked. Well courts have many times to spontaneously invoke the doctrine of primary jurisdiction. Maybe we can and maybe we should but that's something we will need to have the party's views on. But again your honor I think to my mind... Let me ask you, since I'm going to ask the parties for their views on that, let me turn to the merits. Suppose Illinois adopted a somewhat different system in which it said the winning coal plants have to pay the nuclear plants 20% of whatever they bid for winning bids in the FERC auction. Any problem with that under the statute and the FERC's regulations? Well if I understand your hypothetical I do think there would be a problem because then participation and clearance in the FERC auction would be a necessary component of the state scheme. It looks like, the scheme I've described is one in which it looks like the payment called for by the state system is entangled with the payment in the FERC auction. That's how I took your hypothetical. If I understand the plaintiff's argument correctly they say that that's exactly what the ZEC system does and I'm interested in your view on why that's not a correct description. Well it's not a correct description for several reasons. The first is the pricing mechanism is not based on FERC auction prices. It's more obscure. But the price being paid in the auction does seem to play a role in fixing the price of ZEC credits. That's not correct in the sense that the price is based, that the price adjustment is based on market forecasts that futures traders reach by anticipating. Market forecasts predicting the outcome of the regional power auctions. Sure there's a difference though between a forecast price and an auction price. It's like saying instead of basing anything on securities prices we are basing things on securities price futures. But of course securities price futures are locked to real securities prices. So if there were a rule that said states could not make anything turn on the price of securities traded on the New York Stock Exchange, do you think states could avoid that by making prices turn on the price of stock options traded on the New York Stock Exchange? Well I don't know your honor but in this case... Well you may be asking us to answer that question because that may be exactly what the state of Illinois has done. Well how the Securities Commission might regulate futures and how the CFTC might regulate futures is a different context. Here there is no lock between futures prices and actual market prices. If you tell me what the market price is, the FERC market price, I can't tell you what the ZEC adjustment price is. I have no way of knowing. There's not a lock. There's not a connection between the two. I could guess but I couldn't tell you what it is. I think that's an important difference. But even assuming that the state were using actual market prices, I think plaintiffs focus on that really draws an arbitrary line. And to see that I would ask the without any adjustment so that the generators are simply paid the social cost of carbon. From a functional standpoint, there's no reason why that should be lawful and I think plaintiffs would need to concede that it is lawful to have a fixed subsidy. But then when the state includes a consumer protection mechanism that reduces the size of the subsidy, all of a sudden it becomes unlawful. The reason for being unlawful couldn't be that now all of a sudden the state is displacing the wholesale price. Under plaintiffs logic it would have been doing that with a fixed subsidy as well. It can't be that now all of a sudden the state is affecting the wholesale market because the state would have been doing that under the fixed subsidy as well. It can't be that now the generator is insulated from risk in some way because a fixed subsidy that doesn't go down at all actually gives a generator even more protection from risk. The district court treated that as a standing impediment. It's really a merits argument, is it not? Well I think there is a standing argument with respect to the price adjustment too, which is that if the price adjustment is the illegality here, plaintiffs are made better off by that adjustment. Under the Johnson case, this court has said correctly if your injury is not traceable to the illegality, you don't have standing to challenge the illegality. And Johnson involved a rulemaking where the plaintiff said this rulemaking imposes lots of burdens on us. But the illegality that was identified actually made the plaintiff better off. And the court said your illegality is not traceable. Johnson was really a bootstrapping standing argument where an injury by virtue of one regulatory requirement was being bootstrapped to supply an injury for a challenge to another regulatory requirement. That's not what we have going on here. We have an integrated subsidy that consists of the social cost of carbon and then the price adjustment which has a whole bunch of different inputs. So we've really got a challenge to the regulatory hole, I think. I'm happy to talk about the merits as well. So if you'd like to view it as a merits argument, that's fine with me. But the point that I'd like to make is that the line that they're drawing focused on adjusting wholesale prices down is really, it's arbitrary. And I think to see why it's important to understand why did the state do what it did here. And the reason is, for many years the state has been getting the environmental benefits of nuclear power plants for free. It hasn't needed to pay for it, unlike renewable generation which has always needed state subsidies. And the state said it's no longer true. Some of these nuclear plants that provide benefits to us are going to retire and we want to subsidize them. And the state wanted to shape the subsidy around the need because it didn't want to waste consumers money by paying a needless subsidy. And what their position would force the state to do would be to give a fixed subsidy in excess of need, instead of a subsidy that is tied to need, and therefore waste consumers money in order to achieve the end that the state legitimately can seek to pursue. And with respect, I think that's just a very arbitrary and sort of bizarre outcome of the line that they're seeking to draw. And the line, the focus on the price adjustment is also that states every day, all the time in the MISO region and in the PGM region, guarantee cost of service recovery to certain generators. So these generators, what happens is these generators sell into the wholesale market, but the state says we're going to make sure that you can recover your costs. And so if your wholesale revenues are not sufficient to allow you to cover your costs, we're going to make up the difference through charges on retail rate payers. That is a fixed feature of the regulatory system that goes back to the origins of the auctions. The price given by auctions tells people that they need to drop out of the market. Right? And Illinois, that's part of the claim in this case, and it seems to be Illinois is just advertising it. This is what we're doing. We're trying to defeat the outcome of auctions. We think the auction price is going to drive out of the market people we would like to have in it, even though the function of price signals is to tell people to exit and enter. We want to defeat that, and so here's our program to defeat the price signals given by the market. Well, under Hughes, don't you have a big problem when you set out to defeat the market? Well, two responses. Your whole argument is we want to defeat the market. That's our goal. Two responses to that, Your Honor. The first is states, every state program that subsidizes or taxes generation or imposes environmental controls on generation is doing the exact same thing. The market is not this pristine thing. Well, look, that's a problem I have with the plaintiff's argument. Mr. Varelli's attempt to distinguish cap-and-trade systems, which also defeat the market, from this system may or may not fly. But on your feet, you're saying our goal is to defeat the nasty prices given by this auction market, which are leading these two utilities to want to depart the market. Well, that's not what I'm saying, Your Honor. What I'm saying is that FERC's auction is not designed to think about environmental issues at all. It's not designed to think about them. FERC and the Federal Power Act has wholesale sales for the commodity, but leaves to states the duty to and the authority to regulate production and make distinctions between generators of different kinds and to say we actually want clean production in our state and so we're going to subsidize that clean production. That's what states do with and the ZEC program. In any of those cases, the state is saying the FERC's market is not designed to address this problem, and so we're going to address it within the bounds of our regulatory control over production. And we've cited numerous cases in our brief where FERC recognizes that state authority and accommodates that. And indeed, in the WSPP case in dealing with RECs. You may be explaining why Mr. Varelli is right that cap-and- You haven't justified this system, which, as I say, seems to me to link the price of the credit to what's happening in the auction. At least indirectly, it links the price to what people think is happening in the auction in the same way stock future prices are linked to stock prices. But again, Your Honor, that it's no more disruptive of the auction than a fixed subsidy would be. But then you're just disagreeing with Hughes. You think Hughes should have come out the other way. Not at all, Your Honor. And some justices think Hughes should have come out the other way. But it is what it is. Well, Hughes, the key thing that the court focused on in Hughes was that Maryland had imposed a condition on payment that required the generator to actually participate and sell its electricity in the wholesale auction in order to get paid. There was an express condition, and it was that express condition- Look, if you think you avoid Hughes by eliminating that, I mean, that again strikes me as fantasy. There is no world in which these nuclear plants produce energy, but it's not sold onto the regional grid. Because that's the world in which they melt down. In order to produce the energy, they have to get rid of it. Otherwise, it melts their plant. Well, I agree with that, Your Honor, but they can sell it at retail. They can sell it not through the auctions. How are they going to sell it bypassing the regional grid? Well, you put your electricity- Give me a detail about how they can do that. Sure. There's a distinction between putting your electricity on the grid to be transmitted and selling it in the wholesale energy auction. There's a difference between those two things, and when you sell at retail, you put your energy onto the grid and buy a transmission path to the user. That happens all the time, and many nuclear plants throughout MISO and PJM sell largely to retail customers. Who are they selling to? So MidAmerican, for example, is a regulated utility that owns 25% of the Quad Cities plants, and it uses that output to serve its retail customers in the Quad Cities area. So that's how it works in practice, and I do think that the court- I don't think it's pure fantasy that this distinction matters, because there's some degree of formalism that's necessary under the statute. The statute distinguishes between control over production and control over wholesale sale, and in our brief, we point out the legislative history in which Congress was very much aware that these two things are often flip sides of the same coin, yet it chose to divide up the control to regulate these things between two different sovereigns and give the states control over production and the federal government control over wholesale sale. And Congress expressly thought about the possibility that maybe the federal government should have exclusive control over everything that's produced for them, and Congress rejected that explicitly. That was the Senate bill that Congress rejected, and the reason was it wanted to preserve all of the state's pre-existing authority over production, and that's what it did in the Federal Power Act, and that's why the statute is not preempted. Thank you. Thank you, Mr. Price. Mr. Hughes. May it please the Court, I'm Assistant Attorney General Richard Hussack, Counsel for the State Defendants, and I urge the Court to affirm the District Court's judgment. I'd like to spend some time on the Armstrong issue and the related non-merits issues, but I would like to stress now the core difference between the party's characterizations of the program and the plaintiff's. It depends upon the scope of FERC's exclusive jurisdiction to set rates for the wholesale sale of electricity. That has a well-defined meaning. It means setting the price that is exchanged for the delivery of electricity, and the plaintiffs seek to characterize this program as such rate setting, but in fact, it does not fit within that definition. They essentially blow up the boundaries of that definition by trying to fit the Illinois program into it. In fact, what is being conveyed under the Illinois program is not electricity, it is the environmental attributes of a certain type of emission-free nuclear power, and the payments are not conditioned upon the sale of electricity in any wholesale transaction. The plaintiffs would like to disregard the nature of the question. Is there any way in which these plants could sell 100% of their power direct to customers, bypassing the market run by the regional organizations? Could they sell it entirely retail or in some other wholesale transaction? I left the question open. Is there any way they could do that? I don't think as a practical matter they could sell all their output to retail customers. I don't care who they are selling to. Is there any way they can sell it direct, bypassing the auction? Yes, by bilateral contracts, absolutely. And you think it is plausible that they could sell 100% of their power direct? Is there any nuclear plant in the country that does that? I don't know the answer to that question. I don't think that if there's no nuclear plant in the country that does that, then the fact that the state has not formally said, you know, it depends on whether you sell in the auction, doesn't matter. They are going to sell in the auction. I think it does matter because if Illinois isn't setting the price for a sale at wholesale, it's instead compensating for the environmental attributes of something that is related to generation but is not the sale of the electricity that is only on the state regulatory side of the jurisdictional line that the Federal Power Act creates. It would be one thing if, as in Hughes, Illinois said in essence, we are going to determine what price a producer gets for each sale of electricity. But that's not the case here. There is a base price of $16.50 per kilowatt hour and that is what they get. If market prices go down, that is what they're going to get. It's set each year. And so that doesn't change. The fact that the producers ultimately are likely to sell that at wholesale doesn't change the character of the transaction and it doesn't bring it within FERC's jurisdiction to regulate wholesale sales of electricity. The inevitability that it will be sold at wholesale, taken to its logical extreme, would essentially eliminate the state's power to regulate generation by any means that takes into account the fact that power is generated. But that's certainly true for other programs that encourage renewable and environmentally friendly power production. They all depend upon power being produced in a certain way. And as long as that is not conditioned upon, tethered to an actual specific sale, and it is not controlling the price for such a sale, it doesn't fall within the narrow contours of what Hughes says is subject to preemption. Hughes was very clear as to the conditions for its holding and those conditions are not met here. I would like to add that even if the court considered the price adjustment feature of the ZEC program to be problematic, Illinois state law provides that any provision of the act that would be unconstitutional is severable. This is not a constitutional problem. It's a statutory problem. It goes back to my question whether if the FERC expressly said, this is consistent with our idea of what creates just and reasonable prices, would there be any residual problem? Well, there might perhaps be a dormant commerce clause argument. But the dominant problem here is statutory, not constitutional. I think there would be a distinction, though, with respect to the difference between conflict preemption, which certainly implicates the primary jurisdiction issues, and that the plaintiffs seem to gloss over, and a question of exclusive jurisdiction. And it is our position that the FERC's exclusive jurisdiction, different from their concurrent jurisdiction, does present a question of law. And on that question of law, Hughes clearly puts this program on the legitimate side of the line with respect to state power regulation. I do want to address some of the plaintiffs' policy-based challenges to the mechanism that this program adopts. They would like to say that benefits should be given to all nuclear power plants indiscriminately because they all have the same environmental benefits. But they're essentially willing to throw rate-payer money away for no additional environmental benefit. There's a reason why the program is tied to at-risk nuclear power plants in the light of lower-than-expected increases in energy load that have rendered these nuclear power plants that have a long remaining useful life uneconomic. But the goal of the program is not to undo the market's determinations as to who's the most economically efficient producer or not. That happens to be a part of the equation as to why a certain... That comes back to my conversation with Mr. Price. It is the stated goal of Illinois to undo the effect of the price signals being given by the market. Price signals in markets tell firms which ones ought to exit and who should enter. And Illinois wants to defeat the effect of the price signal, which is telling two plants that they ought to exit because they're uneconomic. And to the extent... Illinois may be entitled to do that, but I'm just perplexed at the denial that that's what's going on. It is what's going on. Well, it's what's going on, but that's not the ultimate goal. It's a necessary step on the way to achieving its environmental goals. Certainly the goal of the United States campaign in World War II was not to deliver a bunch of money to GM for making tanks, but it had to do that to accomplish its greater goal. And that's what's going on here. You can't get the environmental benefits that would be avoiding the negative environmental consequences of nuclear power plants shutting down and having their production replaced by fossil fuel burning plants unless you protect and preserve the output of nuclear power plants that avoid those consequences. It's fine to say our aim is to defeat the signals being sent by that market, and we've got a really good reason for doing it. That's fine. Go ahead and say that. I think that's a false choice. I think it's necessary to supplement the revenues of the generators that provide those benefits, but the goal is not to defeat those signals. FERC itself has said repeatedly that its mission is to promote affordability and reliability of energy, but that does not mean that it's hostile to and has to prevent any state policy that pursues a different goal, and that's exactly what this policy is. It is like the WSPP case, it is like the wheel abrader case, it is like the ALCO case, and it is like the other cases by FERC that recognize that in FERC Order 1000, it can accommodate those separate state policies even though they may affect price signals without violating its mission under the Federal Power Act, and the argument that the prices for ZEX should be set in some competitive auction, we have an oligopsony here. There are going to be two, maybe three, or four nuclear power plants that are entitled to sell all the ZEX that are issued under the program. To let them in a competitive market decide how much they should be paid for selling them puts the rate payers over a barrel. That doesn't make any sense. Now it sounds like the state of Illinois just is against competition altogether. Not at all. You need to be careful what you're saying. Every word out of your mouth makes this case sound more like Hughes. I disagree. You may disagree, but that's the effect you're having on your audience. Well, my argument is this, is that Hughes draws a clear line. Illinois just doesn't like markets and we're going to defeat them, so there. No, it doesn't say that. That's the message you're conveying. What it says is that markets that don't take into account the social costs of pollution are not economically efficient in the broader sense of the word, and that it's not FERC's mission to concerns. It's the state's authority with respect to its distinct regulatory authority over production to do so, and it may do so permissibly so long as it does not engage in wholesale rate-setting, and it's not engaged in wholesale rate-setting. It is not requiring, it is not conditioning any payment. This is the same line of argument that the state made in Hughes. I disagree. And it didn't work. No, because the difference in Hughes was that there was no... It persuaded the goal that the program was intended to accomplish in Hughes. In Hughes, the goal was essentially to create capacity and to do so by changing the price in the auctions for sales of capacity. Here, the ZEC price is set once a year. It doesn't change. It can go down from the base level. It can't go up. And whatever the price is on October 17th for the sale of electricity, if it's $5 per kilowatt or $50 per kilowatt, the ZEC price doesn't change. It's always the same, and it's uniquely designed to accomplish the state's independent goal of promoting the environmental benefits of a certain type of emission-free nuclear power. The program is well designed to do so, and it does not trespass upon FERC's authority to set rates for specific sales of electricity. That's not what the program does. Otherwise, you're going to say that every program that generates revenues to a producer of electricity trespasses on FERC's exclusive jurisdiction because those revenues will affect wholesale prices. It would be nice to say that there's a clear division between the state accomplishing its environmental goals and doing so in a way that does not affect prices or does not address the economic efficiency market deficiencies of what FERC is doing, but the whole purpose for the wind and solar renewable programs in Illinois and a majority of the states is to do exactly that, is to encourage a type of program where the narrowly defined concept of economic efficiency doesn't accommodate that or encourage that. I'd like to address briefly the Armstrong concern, which is, and if the court does want further briefing on the primary jurisdiction and on the Illinois BRIC doctrine, we would be glad to provide that. We do think that the plaintiffs, and we've said this in the district court, but because they're only pass-through entities, they wouldn't have a cause of action anyway, even if one existed under ex parte young principles as a cause of action not related to 11th Amendment or subject matter jurisdiction concerns. The baseline proposition here under Armstrong is that not everybody with Article III standing gets to go into federal court and seek a preemption-based injunction against a federal statute. There are some people who certainly do, and those are the targets of enforcement. We don't dispute that. That is not the plaintiffs here. The fallback question is, if a party with respect to a specific statute doesn't qualify for this targeted enforcement basis to bring such a cause of action, then what are the other conditions they have to satisfy? Certainly, if you have a detailed and comprehensive remedial scheme in the federal rights-conferring language in the statute, or there is no zone of interest that encompasses them, they would likewise be excluded. You have the further fact that if they're seeking to enforce an inherently unadministerable program by the courts that is vested in the jurisdiction of a regulatory agency, the court should not step in and treat a common law cause of action for and interfere with that regulatory scheme. Unless the court has other questions, I would urge it to affirm the district court. I fundamentally dispute the plaintiff's legal characterization that this program is rate-setting for specific wholesale sales of electricity. It is not, and the conflict preemption claim, at a minimum, is one that certainly FERC acting within its authority to deal with the markets for wholesale sales of electricity can fully accommodate, but in the absence of such action that is inconsistent with the Illinois program, there would be no basis for finding conflict preemption in this case. Thank you, Your Honors. Thank you, counsel. Anything further, Mr. Verrilli? If Your Honor doesn't mind, I would like to use my two minutes and 40 seconds. Certainly. First, we would welcome further briefing on primary jurisdiction and in the perhaps presumptuous hope that you will give it to us, let me turn to the merits. I think the fundamental question on the merits is whether this case is any different from Hughes in a way that would justify a different outcome. It isn't. I'd like to remind the court that this is on a motion to dismiss. We've alleged in our complaint that they sell all of their output into the wholesale markets. Now, maybe they sell some of it through bilateral contracts, but those are wholesale sales, too. The ZEC program changes the price even of those. But Hughes focused on the terms of the state program, not the facts on the ground. Well, I think it's the facts on the state program is one that necessarily results in a subsidy running to Exelon for every unit that they sell at wholesale. That's the way the program works on its face, and we've alleged that they sell everything at wholesale. It's key to production. But there's no difference. A subsidy for production and a subsidy for wholesale sales are the same thing in this context. As a practical matter, as a factual matter, yes, but that just gets back to the point I made a moment ago. Hughes is key to the actual legal terms of the program, not the facts on the ground. I guess I would disagree with that, Your Honor, and I think I'm repeating something I said before, but let me say it again. If this statute had at the end of it a formal requirement that they do what they in fact do, which is bid everything into the wholesale auction, it wouldn't change the operation of the statute one iota, and it would be preempted for the same reason. And if I could in my time, let me make two additional points here. One is, think about this from the perspective of the load-serving entities, the companies that have to purchase power retail. The statute requires them to purchase ZECs from Exelon for 16% of their anticipated retail needs. Well, where do they get their anticipated retail needs? On the wholesale market. How much of the wholesale market do Exelon's Quad Cities and Clinton plants produce? Well, it just so happens, 16%. So it's a perfect match. It's obviously designed to ensure that Exelon gets, in addition to the price that is set at the FERC-approved auction, this ZEC payment on top of it for every single unit they sell. It's a perfect match that proves it, and I do think that that gets to a point that you made earlier, Judge Easterbrook, which is that this does much more than just influence auction outcomes. It does just what the Supreme Court said, and by the way, the Supreme Court was unanimous in Hughes, so nobody bought the argument that the state is advancing here. What the Supreme Court said in Hughes is that there may be things you can do, there's certainly things you can't do, and one thing you cannot do is give a subsidy for each unit of wholesale sales over and above the FERC-approved rate, and that is what the ZEC program does. Thank you. Thank you, Mr. Borrelli. Mr. Giordano, you wish to use your 26 seconds. We'll round it up to 30. Oh, thank you, sir. We're very generous. Thank you, Your Honor, appreciate that. The point I want to make is that FERC is currently considering and is expected to decide this month on the Department of Energy's grid resiliency pricing proposal. We mentioned this in our brief. If adopted, this will substantially increase capacity charges for all nuclear and coal plants within the RTOs. This is the proper approach of FERC deciding whether the structure of the competitive market should be revised to increase revenues for all nuclear plants rather than one state singling out two favored nuclear plants for subsidies and FERC reacting to it. Thank you very much. We would appreciate it if the parties would file supplemental briefs within 14 days of oral argument addressing three matters. One is whether we should defer to the FERC's primary jurisdiction. The second is whether Ex parte Young is available as the basis of equitable relief in this case. I've addressed that separately. The briefs have addressed Armstrong, but I think we need to address Ex parte Young directly. And the third is whether the principle of Illinois BRIC would apply as applied to everybody other than a participant in the wholesale market prevents their suits. These briefs are due in 14 days, and when they are received, the case will be taken under advisement. Our next case for argument...